**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **PAMELA K. ALEXANDER,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:07-CV-1749-K (BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment* ("Pl. Mot."), filed January 31, 2008, and *Commissioner's Motion for Summary Judgment* ("Def. Mot."), filed March 31, 2008. Plaintiff filed a reply ("Reply") on May 1, 2008. Having reviewed the evidence of the parties in connection with the pleadings, the Court recommends that the final decision of the Commissioner be **AFFIRMED**.

## I. BACKGROUND[1]

### A.     Procedural History

Pamela K. Alexander ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

benefits ("DIB") under Title II of the Social Security Act. Plaintiff submitted her application for DIB on September 20, 2004. (Tr. at 50-52). She claimed she had been disabled since May 5, 2003, due to a tumor removed from her back and scar tissue on the nerve. (Tr. at 94). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 41-44, 37-39). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 36). A hearing, at which Plaintiff personally appeared and testified, was held on October 11, 2006. (Tr. at 489-508). On December 13, 2006, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 10-19). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in her request for review did not provide a basis for changing the ALJ's decision. (Tr. at 5-7). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 5). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on October 16, 2007.

**B.** **Factual History**

    **1.** **Age, Education, and Work Experience**

Plaintiff was born in 1961. (Tr. at 50). At the time of the hearing before the ALJ, she was 44 years old. (*See* Tr. at 493). She completed four years of college and is a registered nurse. (Tr. at 101, 503). Her past relevant work experience included work as a staff nurse, a triage nurse (nurse consultant), and a transplant coordinator, all in a hospital setting. (Tr. at 71, 503-04). Plaintiff last worked on May 5, 2003. (Tr. at 50).

    **2.** **Medical Evidence**

Plaintiff has a history of pain in the right hip area that began in November of 2001. (Tr. at 113, 369). On May 21, 2002, Dr. John Crawford, M.D. performed an exploratory surgery of

Plaintiff's abdomen and removed a large cystic mass from behind her peritoneam, the membrane that lines the cavity of the abdomen. (Tr. at 157-59). Plaintiff reported relief after the surgery, but her pain returned in the fall of 2002. (Tr. at 113, 369).

On November 26, 2002, Dr. George Farhat, M.D. assumed care for Plaintiff's pain control. After a physical examination, Dr. Farhat found tenderness on Plaintiff's right sacroiliac joint and right piriformis muscle areas but not on her lumbar paraspinal muscles or anterior abdomen. (Tr. at 370). He noted that her lumbar spine movements were within normal limits but that flexion exacerbated the pain. He did not observe any gross focal motor or sensory deficits of her lower extremities, and her reflexes were normal. He also noted that the straight leg raise test on the right exacerbated her pain. (Tr. at 371). Dr. Farhat assessed Plaintiff with neuritis in her lower right extremity and prescribed Neurontin. *Id*. On a follow-up visit on December 6, 2002, Dr. Farhat noted that an MRI showed significant degenerative disease and facet joint arthropathy at the L4-5 and L5-S1 levels. (Tr. at 368). Over the next few months, Dr. Farhat prescribed Neurontin, Vicodin, OxyContin, and Vioxx to treat Plaintiff's pain. (Tr. at 364, 365, 368, 371). He also administered epidural steroid injections on December 13, 2002, and January 10, 2003. (Tr. at 366-67, 361-62). The injections helped with Plaintiff's back pain but not with her right thigh pain. (Tr. at 363, 365). Due to the limited success of the injections, Dr. Farhat opined that Plaintiff's thigh pain was not related to her arthritic and degenerative changes in her spine. (Tr. at 363). He suggested a right lateral femoral cutaneous nerve block (injection of local anesthetic) for its diagnostic and therapeutic properties. (Tr. at 363).

On January 20, 2003, Plaintiff visited Dr. Philip Bechtel, M.D., a spine surgeon. Dr. Bechtel reviewed an MRI from December of 2002 that showed no signs of a cyst or any other abnormalities,

except for a small disc protrusion at T10/11 of the lumbar spine that resulted in a mild effacement of the ventral thecal sac. (Tr. at 112-13, 232). In Dr. Bechtel's opinion, this protrusion was not the origin of Plaintiff's pain. (Tr. at 114).

On January 21, 2003, Dr. Farhat increased Plaintiff's OxyContin for pain control. (Tr. at 360). At her next visit three weeks later, she decided not to proceed with the recommended nerve block procedure. (Tr. at 359). The following week, on February 24, 2003, Dr. Farhat noted that Plaintiff "is not interested in any procedure to try to help with her condition and only wants to be treated with medications." (Tr. at 358). He also noted that Plaintiff wanted to stop taking OxyContin and that she stopped taking Neurontin because it made her groggy even though it provided relief. *Id*. Dr. Farhat instructed Plaintiff to do daily stretching exercises and requested a follow-up visit in one month. *Id*. Plaintiff, however, did not return to Dr. Farhat until April of 2004. (Tr. at 357).

On March 5, 2003, Plaintiff was admitted to Harris Methodist Hospital for evaluation by Dr. Allan Kelly, M.D. of her severe and chronic abdominal and back pain. (Tr. 122-25). Dr. Kelly commented that a trial off of narcotic therapy did not go well and that Plaintiff experienced crippling pain. (Tr. at 122). He noted problems with weeping and depression and requested a psychiatric evaluation. (Tr. at 125). He also referred her to physical therapy, but the therapist determined she was not a candidate at that time because she could ambulate effectively without assistance and did not respond well to previous attempts at physical therapy. (Tr. at 131). On discharge, Dr. Kelly noted that a regular schedule and regular employment were necessary parts of Plaintiff's rehabilitation. (Tr. at 121). He had no explanation for the cause of her pain. *Id*.

Dr. Paul Grant, M.D., a pain management specialist, examined Plaintiff on March 28, 2003.

He opined that Plaintiff had a possible sacroiliac joint dysfunction on the right. (Tr. at 250). He recommended a joint injection and prescribed Hydrocodone, OxyContin, and Amitriptyline. *Id*. Dr. Grant administered a right sacroiliac joint injection on April 8, 2003. (Tr. at 248).

On April 15, 2003, Plaintiff visited Dr. Keith Livingstone, M.D. (Tr. at 285-88). Dr. Livingstone noted that Plaintiff did not work from December 2002 to March 2003, when she returned to work part-time. (Tr. at 285). On this day, Dr. Livingstone also completed a "Physical Capacities Evaluation" for Plaintiff's short term disability insurance carrier. (Tr. at 287-88). Dr. Livingstone noted that Plaintiff could sit, stand, or walk 4 hours in an eight hour work day. (Tr. at 287). He noted that she could only occasionally reach overhead; all other strength demands were either "frequent" or "continuous." *Id*. One month later, Dr. Livingstone wrote that Plaintiff wanted to go on full-time disability and that she was unable to be at work. (Tr. at 284). He diagnosed her with low back pain and depression. *Id*.

Ann McIntyre, a licensed physical therapist, performed a functional capacity evaluation on June 9, 2003. (Tr. at 185-199). Ms. McIntyre found that Plaintiff had a maximum sitting tolerance of 30 minutes. (Tr. at 189). Ms. McIntyre determined that Plaintiff could not return to work as a nurse and that she should be restricted to light work. (Tr. at 198-99).

Dr. Kenneth Buley, M.D. examined Plaintiff on September 5, 2003. (Tr. at 230-233). Dr. Buley was uncertain of the cause of Plaintiff's pain, but doubted that it was due to scar tissue irritating her nerves. (Tr. at 232). Dr. Buley believed that Plaintiff was unable to perform her essential job functions on the date of his examination, but expected her condition to improve over the next two to three months to the point where she could return to work. He recommended that she pursue an aerobic walking exercise program, weight loss, trunk strengthening, and stretching and

flexibility exercises. (Tr. at 232-33). Plaintiff returned to Dr. Buley for a follow-up evaluation on October 16, 2003. (Tr. at 226-29). Dr. Buley observed that Plaintiff was in no acute distress while sitting in a chair and that she ambulated with a normal pace without difficulty. (Tr. at 228). On physical examination, he found a normal range of motion in the lumbar spine, negative straight leg raise bilaterally, and 5/5 motor strength in the lower extremities. *Id*. Dr. Buley repeated his impression of chronic lower back pain of unclear etiology. (Tr. at 228). Dr. Buley completed a physical capacities evaluation form in which he found that Plaintiff could sit for four hours and stand and walk for a total of four hours in an eight hour work day. (Tr. at 226). Dr. Buley also wrote that he "cannot further justify her claim of disability without objective evidence of an ongoing problem...she does not appear to be functionally limited today." (Tr. at 228-29). He recommended that she taper her opioid medications, engage in more physical activity, and return to work. (Tr. at 229).

On February 17, 2004, Dr. Grant submitted a letter to Plaintiff's private disability insurance carrier. (Tr. at 247). The letter stated that "there is no physical reason for this patient, an RN, [not] to return to some type of nursing duty. I do not feel that she is disabled. It is noted, however, that her employer does not want her to return to work on her current medication regime." *Id*. He noted that an interferential stimulator helped her pain. He suggested a psychiatric consultation and treatment, a gradual weaning off of OxyContin, and daily physical therapy including aqua therapy. *Id*.

On referral from Dr. Grant, Plaintiff saw Dr. John Sklar, M.D. on March 3, 2004. (Tr. at 315-17). His examination found moderate tenderness to palpation in the upper lumbar paraspinal muscles on the right, with severe tenderness in the lower lumbar paraspinals and adjacent gluteal

muscles. There was also moderate tenderness to palpation in the lateral gluteals on the right. Her lumbar range of motion was decreased, especially for flexion. Her left lateral bending was decreased secondary to pain. Dr. Sklar believed that Plaintiff could make "quite a bit of headway" in controlling her pain with psychological pain control techniques. (Tr. at 316). He recommended that Plaintiff gradually increase her home activity and exercise levels. *Id.*

On May 5, 2004, Dr. Robert Ulrich, M.D., an Assistant Professor of Neurology at the University of Texas Southwestern Medical Center at Dallas, examined Plaintiff. (Tr. 321-323). Dr. Ulrich found diminished sensation in Plaintiff's hands distally and poor effort with strength testing on the left side. (Tr. at 322). Dr. Ulrich suspected that Plaintiff's pain resulted either from scar tissue at the site of her resected cystic mass or recurrent endometriosis affecting the intrapelvic nerves.[2] Dr. Ulrich prescribed Pamelor, noting that the Plaintiff has some depression, difficulty sleeping and nerve pain. He hoped that she could manage her pain on a reasonable dose of Pamelor and be weaned from some of her narcotic medications. He felt that this would take some time "as she is on a significant amount [of narcotic medications] and has been on these medications for some time." (Tr. 323).

Plaintiff returned to Dr. Farhat on April 13, 2004. (Tr. at 357). Dr. Farhat noted that counseling, hypnosis, and steroid injections have not helped her symptoms. He also wrote that he "would be more than happy to take over her care, but she has to see only one physician to prescribe narcotics for her, and she cannot go doctor shopping. She was agreeable to that." *Id.* Dr. Farhat recommended hypnosis, counseling, and tapering her narcotic medications. *Id.*

On referral from Dr. Farhat, Plaintiff consulted with Dr. Scott Hall, M.D. a neurologist, on

---

[2] Endometriosis is the presence and growth of functioning uterine tissue in places other than the uterus that often results in severe pain and infertility. Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Oct. 8, 2008).

May 3, 2004. (Tr. 326-327). Dr. Hall's examination revealed very brisk reflexes throughout, greater in the legs than the arms. (Tr. 326). An EMG was within normal limits but clinically the Plaintiff exhibited left thoracic dermatomal sensory loss and significant hyperreflexia, suggesting the possibility of myelopathy.[3] He recommended a trial of Lamictal for her neuropathic pain. (Tr. 327). Dr. Hall also ordered an MRI of Plaintiff's cervical and thoracic spine, which revealed mild to moderate multilevel disc dessication and degenerative spondylosis in the mid-thoracic spine. (Tr. 330).

Following the evaluation by Dr. Hall, Plaintiff returned to Dr. Farhat, who felt that the etiology of Plaintiff's complaints was neuropathic pain. (Tr. at 356). He decided to taper her OxyContin and gave her a prescription for Avinza. She was to stay on Neurontin, Effexor and Lamictal, the latter of which was prescribed by Dr. Hall. Dr. Farhat also felt that the Plaintiff may be helped by a nerve blockade. *Id.* Two weeks later, Dr. Farhat also reviewed Dr. Ulrich's evaluation. (Tr. at 355). Dr. Farhat agreed with Dr. Ulrich and suggested that she try Pamelor; he also advised her to do stretching exercises and avoid heavy pushing, pulling, and lifting. *Id.* He administered a trigger point injection on July 6, 2004, and again on October 26, 2004. (Tr. at 353, 345). After each procedure, she had significant improvement but still experienced some pain. (Tr. at 352, 344). Dr. Farhat administered a right lower lumbar plexus block on February 11, 2005. (Tr. at 376-377). The procedure did not help "tremendously" and Plaintiff continued to experience pain. (Tr. at 375). He continued her medications and stretching exercises and discussed the possibility of a spinal cord stimulator. (Tr. at 374-75).

On May 3, 2005, Dr. Farhat implanted a trial dorsal column stimulator. (Tr. at 452-453).

---

[3] Myelopathy is any disease or disorder of the spinal cord or bone marrow. Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Oct. 8, 2008).

She found it to be effective, and on July 11, 2005, Dr. Larry Kjeldgaard, D.O. implanted a permanent stimulator. (Tr. at 391-393). In follow-up visits, Plaintiff initially expressed concern about the reduction in her medications but later stated that she was "pleased" with her status. (Tr. at 416, 414). Plaintiff reported that the stimulator provided some relief but did not take away all of her pain. (Tr. at 412). Dr. Kjeldgaard performed a second operative procedure on November 11, 2005, to replace the paddle electrodes. (Tr. at 388).

Plaintiff returned to Dr. Farhat in December 2005 and January 2006 and reported tremendous improvement, with the stimulator covering the affected painful area. (Tr. at 441-442). On February 1, 2006, however, she reported that the stimulator was not enough to control her pain, especially when she was active. (Tr. at 440). Dr. Farhat increased her OxyContin for breakthrough pain and refilled her Avinza. He also placed her on Lexapro to help her with her mood. He noted that she was continuing on Effexor. *Id.*

On March 2, 2006, Plaintiff told Dr. Kjeldgaard that she was doing "okay" and that her spinal cord stimulator took away approximately 30% of her pain. (Tr. at 406). She also told Dr. Kjeldgaard that she was "able to do more and be more active with her stimulator." *Id.*

On June 12, 2006, Dr. Farhat completed a functional capacity assessment supplied by Plaintiff's attorney as part of her DIB application. (Tr. at 424-427). Dr. Farhat advised that the Plaintiff suffers from right lower back, buttock and thigh pain. (Tr. at 424). Dr. Farhat opined that Plaintiff could walk, stand, and sit less than 2 hours each in an 8 hour work day. (Tr. at 425). He opined that Plaintiff's retroperitoneal mass was the cause of Plaintiff's symptoms and that she could not sustain full-time work activity. (Tr. at 426).

### 3. Hearing Testimony

A hearing was held before the ALJ on October 11, 2006. (Tr. at 489-508). Plaintiff

appeared personally and was represented by an attorney.

### 1.  *Plaintiff's Testimony*

Plaintiff testified that she was 45 years old and that she lived with her husband and two minor children.  (Tr. at 493-94).  She last worked in May of 2003 as a bone marrow transplant coordinator but had to stop due to persistent pain in her lower right back.  (Tr. at 494).  She estimated that on a scale of one to ten, her pain was an eight without medication and a five when she takes all of her medicine.  (Tr. at 495).  The side effects of her medication include drowsiness and short-term memory loss.  *Id.*

On a typical day, Plaintiff testified that she rarely leaves her home due to pain.  (Tr. at 496).  She no longer performs housework but still cooks simple dinners.  She lays down to relieve her pain and watches television, but she does not read novels anymore because she forgets what she reads.  Although she walks around her house, she estimated that she spends 75% of her time in bed.  She helps her children with their homework.   She also drives short distances to run errands, such as picking her children up from school, going to doctor's appointments, and shopping for groceries.  (Tr. at 496-97).  She testified that she stood or walked for up to two hours a day and that it was very difficult for her to sit.

Under examination by her attorney, Plaintiff testified that she cannot sit at the dinner table with her family due to her pain.  (Tr. at 498).  She also testified that although her nerve stimulator has provided some relief, it has not alleviated her pain to where she is able to do more.  She continues to take prescription medication for breakthrough pain.  (Tr. at 499).

Under re-examination by the ALJ, Plaintiff testified that all of the doctors who have treated her all agreed that there was nothing they could do to help her.  (Tr. at 501).  She also testified that she tried rehabilitation and exercising in the past but that these did not help.  She estimated that her

nerve stimulator took away approximately 20% of her pain and that she takes breakthrough medication every five to six hours. (Tr. at 502).

## 2. *Vocational Expert's Testimony*

Ms. Dillon Snowdon, a vocational expert ("VE"), testified at the hearing. She testified that Plaintiff was a registered nurse by training and that her past relevant work experience could be classified as skilled with a specific vocational preparation ("SVP") of 7 at the sedentary, light, and medium exertion levels. (Tr. at 504).

The ALJ asked the VE to assume a hypothetical person with Plaintiff's educational and vocational history. The hypothetical person had the following limitations: lift and carry occasionally 10 pounds, lift and carry frequently no more than 10 pounds; stand and walk 6 hours in an 8-hour work day; sit 6 hours in an 8-hour work day with the ability to sit and stand at will; push and pull up to 25 pounds; no climbing or crawling; occasional balancing; frequent kneeling, crouching, and stooping; no manipulative, visual, or communication limitations; no working around hazardous, moving machinery or at unprotected heights; able to understand, remember, and carry out detailed but not complex instructions; able to interact appropriately with the public, supervisors, and coworkers; respond appropriately to the usual work pressures and changes in the work setting. (Tr. at 504). The VE testified that this person could not perform Plaintiff's past relevant work, but that this person retained transferrable skills from previous work as a nurse. The VE testified that the hypothetical person could work as a health technician (light, semiskilled, SVP 3, with 50,900 positions in the national economy and 3,400 in Texas); bench assembler (unskilled, with 330,000 positions in the national economy and 17,000 in Texas) and bench inspector (unskilled, with 117,000 positions in the national economy and 6,700 in Texas). (Tr. at 505).

Under questioning by Plaintiff's attorney, the VE testified that a person who missed one day

a week would be unable to maintain employment. (Tr. at 506). The VE also testified that a person who could not sit for a 30-minute period or who could not stand for more than 3 hours would not be able to engage in full-time employment. *Id*.

## C.    **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on December 13, 2006. (Tr. at 10-19). The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, May 5, 2003. (Tr. at 14, ¶¶1, 3). He found that Plaintiff had the severe impairment of back pain, but that her severe impairment did not meet or equal a listed impairment. (Tr. at 14, ¶¶4,5).

The ALJ found that Plaintiff retained the following residual functional capacity ("RFC"): occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday while periodically sitting and standing at will to relieve pain or discomfort; push and/or pull 25 pounds; never climb ramps, ladders, ropes, or scaffolds or be exposed to unprotected heights; occasionally balance; never crawl or operate hazardous moving machinery; frequently kneel, crouch, and stoop; understand, remember, and carry out detailed instructions; interact appropriately with the public, supervisors, and coworkers; respond appropriately to usual work pressures and changes in the work setting; and no restrictions on manipulative, visual, or communicative abilities. (Tr. at 14-15, ¶6). The ALJ noted that the medical evidence confirmed the existence of an underlying medically determinable impairment that could reasonably cause some of the alleged functional limitations. (Tr. at 17). The ALJ, however, questioned Plaintiff's credibility because her symptoms suggested a greater severity of impairment than shown by the objective medical evidence and because she rescheduled or discontinued physical therapy even though it reduced her pain. *Id*.

The ALJ found that Plaintiff could not perform her past work as a nurse but that she retained transferrable nursing skills. (Tr. at 17-18, ¶¶8, 9). Considering Plaintiff's RFC, transferrable skills, and testimony of the VE, the ALJ determined that Plaintiff could perform semi-skilled and unskilled jobs existing in significant numbers in the regional and national economy. (Tr. at 18-19, ¶12). The ALJ also determined from the VE's testimony that the referenced jobs were not in conflict with the Dictionary of Occupational Titles ("DOT"). (Tr. at 19). The ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any relevant time through the date of his decision. (Tr. at 19, ¶13).

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B. Issues for Review**

Plaintiff presents the following issues for review:

(1) Did the Defendant Commissioner properly evaluate all of the evidence of record, including opinion evidence of the treating physicians?;

(2) Did the Defendant Commissioner properly evaluate credibility?; and

(3) Did the Defendant Commissioner carry his burden at step 5 of the sequential evaluation of disability by establishing the existence of other work in significant numbers which the Plaintiff can perform?

(Pl. Mot. at 1).

**C.**     **Issue One: Medical Evidence**

Plaintiff first contends that the ALJ failed to evaluate the medical evidence properly. Specifically, she contends that he improperly relied upon the assessment by Dr. Livingstone and rejected Dr. Farhat's opinion, her pain management specialist. (Pl. Mot. at 12-14).

In the Fifth Circuit, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with…other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). If good cause exists, an ALJ may give a treating physician's opinion little or no weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 456.

The Fifth Circuit held in *Newton* that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the physician's

length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id*. at 456 (citing 20 C.F.R. § 404.1527(d)(2)). However, the court expressly excluded from the scope of *Newton* those cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458. Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

In this case, the ALJ considered several pieces of evidence in his assessment of Plaintiff's RFC. In addition to Dr. Livingstone's April 2003 assessment, the section on Plaintiff's RFC in the ALJ's written decision cites to medical records from Dr. Bechtel, Dr. Buley, Dr. Grant, Dr. Sklar, and Dr. Farhat. (Tr. at 15-16). It is apparent from the medical records of these doctors that Dr. Livingstone was not the only one to question Plaintiff's professed limitations. For example, Dr. Buley found that Plaintiff was not functionally limited when he examined her and stated that he "cannot further justify her claim of disability without objective evidence of an ongoing problem." (Tr. at 228-29). Dr. Grant could not find any physical reason for why Plaintiff could not return to some type of nursing duty. (Tr. at 247). Dr. Farhat noted "tremendous" improvement from the

trigger point injections and implanted dorsal column stimulator, although these procedures did not completely control her pain. (Tr. at 352, 344, 440-42). Considering the findings of these doctors, the ALJ determined that Plaintiff's RFC permitted her to engage in substantial gainful employment. Plaintiff's citations to instances in which she alleges continuing complaints of severe pain is in effect a request for the Court to reweigh the evidence and substitute its own judgment for that of the ALJ, which is not permitted under the standard of review. *Greenspan*, 38 F.3d at 236.

Plaintiff also contends that the ALJ did not consider the factors set forth in 20 C.F.R. § 404.1427(d) when he discounted the weight of the interrogatory Plaintiff's attorney supplied to Dr. Farhat. (Pl. Mot. at 12-13; *see* Tr. at 17, 424-27). The ALJ, however, was not required to consider these factors because reliable medical evidence from other treating and examining physicians controverted the conclusion expressed in Dr. Farhat's interrogatory. *Newton*, 209 F.3d at 453. As discussed in the preceding paragraph, the ALJ cited medical evidence from other treating and examining physicians and Dr. Farhat himself that did not support Plaintiff's alleged limitations. Since medical evidence in the record supported a conclusion contrary to that in Dr. Farhat's interrogatory, the ALJ was free to reject this particular opinion. *Martinez*, 64 F.3d at 176.

Additionally, even though the ALJ was not required to apply the factors from 20 C.F.R. § 404.1527(d)(2) to his analysis of Dr. Farhat's interrogatory, he used this regulation as a framework to explain why he granted it little weight. In his half-page discussion on this topic, the ALJ recounted the length, frequency, and nature and extent of Dr. Farhat's treatment of Plaintiff. (Tr. at 16-17). The ALJ also noted that Dr. Farhat's opinion was not supported by and inconsistent with the medical record as a whole, including his own treatment notes. *Id*. The only factor the ALJ did not explicitly address in his discussion of the interrogatory was Dr. Farhat's specialization. *See id.*; 20 C.F.R. § 404.1527(d)(5). Given that the ALJ did not need to apply the factors from 20 C.F.R.

§ 404.1527(d)(2), the failure to consider one of the factors was not error.

Plaintiff also asserts that if the ALJ did not understand the reasons for Dr. Farhat's interrogatory, he was under a duty to recontact the treating physician for clarification. (Pl. Mot. at 13-14). In support of this assertion, she cites to SSR 95-6p and 20 C.F.R. § 404.1512. Both of these sources are premised upon the ALJ either not being able to ascertain the basis of the opinion from the case record (SSR 96-5p) or an inadequate record (§ 404.1512). *See* SSR 96-5p, 1996 WL 374183, at *6 (S.S.A., July 6, 1996); 20 C.F.R. § 404.1512(e). Neither of these situations applies to this situation because the ALJ gave specific reasons for discounting Dr. Farhat's opinion and because the medical record was well-developed with respect to Plaintiff's allegations of disabling pain.

Finally, Plaintiff contends that the ALJ improperly rendered a medical opinion because he determined that there was no underlying medical impairment which can produce Plaintiff's symptoms. Plaintiff does not provide a citation to this assertion. (*See* Pl. Mot. at 14). Upon the Court's own review of the ALJ's decision, the ALJ concluded the opposite; he stated that "[t]he evidence in this matter *confirms* the existence of an underlying medically determinable impairment that could reasonably be expected to produce some functional limitations." (Tr. at 17) (emphasis added). Plaintiff's final contention is therefore without merit since it misstates the ALJ's findings.

In sum, the Court finds that the ALJ applied the proper legal standards in weighing the medical evidence and that substantial evidence supports his determination of Plaintiff's functional limitations. *Greenspan*, 38 F.3d at 236; *Leggett*, 67 F.3d at 564. Plaintiff's insistence that the ALJ failed to evaluate the evidence properly is in reality a request for the Court to reweigh the evidence and substitute its judgment for that of the ALJ's, which is beyond the scope of judicial review. *Greenspan*, 38 F.3d at 236

**D.      Issue Two: Credibility**

Plaintiff next contends that the ALJ failed to evaluate her credibility properly.  (Pl. Mot. at 15-17).

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994).  Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

To shed light on an individual's credibility, Social Security regulations provide a non-exclusive list of the following seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."  (*Id*. at *3).  Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form.  It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered."  *Prince v. Barnhart*, 418 F.Supp.2d 863,

871 (E.D. Tex. 2005).  Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints.  *Falco*, 27 F.3d at 164.

In this case, the ALJ stated that he considered the medical evidence and Plaintiff's statements in accordance with SSR 96-7p.  (Tr. at 17).  In support of his credibility determination, he cited to testimony from the administrative hearing in which Plaintiff addressed her daily activities; the location, duration, frequency, and intensity of her pain; treatment, other than medication, for relief of pain; and measures other than treatment used to relieve pain.  *See id.*  At the administrative hearing, the ALJ also explored factors that precipitate and aggravate symptoms as well as the type, dosage, effectiveness, and side effects of any medication taken to alleviate Plaintiff's pain.  (*See* Tr. at 495-98).  Thus, during the administrative hearing and in his written decision, the ALJ explicitly addressed six of the seven factors enumerated by SSR 96-7p; the only factor not addressed was factor 7, the catch-all provision.  He therefore evaluated her credibility in accordance with SSR 96-7p.  Any requirement that the ALJ enumerate the seven factors or address the catch-all provision would impose a "formalistic rule" on a determination in which the ALJ is entitled deference.  *Falco*, 27 F.3d at 164; *see Carrier*, 944 F.2d at 247.

Plaintiff raises three specific objections to the ALJ's credibility determination.  She first contends that the ALJ mischaracterized her testimony in his administrative decision.  (Pl. Mot. at 15).  In support of this argument, Plaintiff emphasizes that her medications make her drowsy and forgetful, that she cannot handle her own finances, and that she is able to do little around the house except for lay in bed and watch television.  This argument requests the Court to reweigh the evidence, retry the issues, and substitute its own judgment for that of the ALJ, which it is not permitted to do.  *Greenspan*, 38 F.3d at 236.  Plaintiff next states that the ALJ improperly relied

upon objective medical evidence in his credibility assessment. This argument is without merit since SSR 96-7p, which Plaintiff quotes in support, explicitly requires the ALJ to consider the entire case record, including the objective medical evidence. (1996 WL 374186, at *1; *see* Pl. Mot. at 16). Moreover, as discussed in the preceding paragraph, it is clear that the ALJ considered Plaintiff's own statements when he assessed her credibility. Finally, Plaintiff contends that the ALJ disregarded emotional factors that complicated her perception of pain. (Pl. Mot. at 17). In support of this argument, Plaintiff relies upon SSR 88-13, an out-of-date ruling superseded by SSR 95-5p, which in turn was superseded by SSR 96-7p. *See* 1995 WL 670415, at *1 (superseding SSR 88-13); 1996 WL 374186, at *1 (superseding SSR 95-5p). To the extent that Plaintiff argues that her pain symptoms are the result of a mental impairment, she presented no evidence of a diagnosis from a treating or examining physician that she suffers from a severe mental impairment. At most, there is some evidence of depression, but there is no indication that it affected her perception of pain or that it was a severe impairment within the meaning of the Social Security regulations. (*See e.g.*, Tr. 125, 284, 323).

Based on a review of the medical evidence, Plaintiff's testimony, and the administrative decision, the Court finds that the ALJ evaluated her credibility in accordance with the proper legal standards. *Greenspan*, 38 F.3d at 236. The Court further finds that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints about her limitations were not completely credible. *Leggett*, 67 F.3d at 564.

## E. Issue Three: Availability of Other Work

Finally, Plaintiff contends that the ALJ did not meet his burden at step 5 because he failed to inquire whether the VE's testimony conflicted with the DOT as required by SSR 00-4p. (Pl. Mot. at 17-18).

### 1.     SSR 00-4p

Social Security Ruling 00-4p requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by the VE and information in the DOT or its companion publication, the Selected Characteristics of Occupations (SCO) defined in the Revised DOT. SSR 00-4p, 2000 WL 1898704, *1-2 (S.S.A., Dec. 4, 2000). As part of his duty to fully develop the record at the hearing level, the ALJ must inquire on the record whether or not there is such an inconsistency. *Id*. at *4. Furthermore, the ALJ must also explain in the decision how any identified conflict was resolved. *Id*. at *4. Neither the DOT nor the VE evidence automatically trumps when there is a conflict. *Id*. at *2; *Siller v. Barnhart*, 2005 WL 1430361, *7-8 (W.D. Tex. June 17, 2005) (finding that neither the DOT nor VE testimony should automatically be accorded controlling weight.) However, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. SSR 00-4p, 2000 WL 1898704, at *2. When there is an "apparent unresolved conflict" between the DOT and VE testimony, the ALJ must elicit a reasonable explanation for the discrepancy. *Id*. Since the burden is on the ALJ to fully develop the record prior to determining disability, the claimant is not required to raise the issue of any discrepancy at the hearing. *Romine v. Barnhart*, 454 F.Supp.2d 623, 627-28 (E.D. Tex. 2006) (citing *Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006)). Thus, the responsibility lies with the ALJ to ask about any possible conflict between the VE's testimony and the DOT.

In this case, the ALJ did not ask the VE at the administrative hearing whether her testimony conflicted with information in the DOT or SCO. (*See* Tr. at 503-08). In his written decision, however, the ALJ "conclude[d] from the vocational expert's testimony that the above jobs [referring

to the VE's examples of other work] are not in conflict with the *Dictionary of Occupational Titles*."
(Tr. at 19). This conclusion was improper because there is no provision in SSR 00-4p for the ALJ
to determine on his own if there is a discrepancy between the VE's testimony and the DOT; the ALJ
must elicit this information from the VE on the record. SSR 00-4p, 2000 WL 1898704, at *2. Thus,
the ALJ erred when he failed to inquire on the record if the VE's testimony conflicted with the DOT.

## 2. Prejudice

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not
required" and a court "will not vacate a judgment unless the substantial rights of a party are
affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). A violation of a ruling may
"constitute error warranting reversal and remand when an aggrieved claimant shows prejudice
resulting from the violation." *Pearson v. Barnhart*, 2005 WL 1397049, at *4 (E.D. Tex. May 23,
2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).[4] A claimant establishes prejudice
by showing that adherence to the ruling might have led to a different decision. *Newton*, 209 F.3d
at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995)). Remand for failure to comply with
a ruling is appropriate only when a complainant affirmatively demonstrates ensuant prejudice. *Hall
v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981).

Plaintiff did not present any argument for how she was prejudiced by the ALJ's failure to
reconcile the VE's testimony with the DOT. (*See* Pl. Mot. at 18; Reply at 5). Nor did she provide
any example of an apparent unresolved conflict between the VE's testimony and the information in

_____

[4] A violation of a regulation, on the other hand, will constitute a basis for reversal of agency action and
remand when a reviewing court concludes that the error is not harmless. *Pearson*, 2005 WL 1397049, at *4 (citing
*Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Harmless error exists when it is inconceivable that a
different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F.Supp.2d
811, 816 (E.D. Tex. 2006) (citing *Frank*, 326 F.3d at 622). Harmless error and prejudice, although similar in
substance, are different procedurally. *Id.*

the DOT. Instead, she argues that the ALJ's failure to inquire about a conflict means that the he cannot rely on the VE's testimony and that the decision is procedurally defective. Procedural perfection, however, is not required in administrative proceedings. *Mays*, 837 F.2d at 1364. Since Plaintiff failed to demonstrate prejudice from the ALJ's failure to follow SSR 00-4p, remand is not warranted. *Hall*, 660 F.2d at 119.

## III.   RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

**SO RECOMMENDED**, on this 18th day of October, 2008.

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE